## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**GOLDEN HOME HEALTH
CARE, LLC,** *et al.***,**

                **Plaintiffs,**

    **v.**

**SEEMA VERMA,** *et al.***,**

          **Defendants.**

                          **Case No. 2:20-cv-2954**
                          **JUDGE EDMUND A. SARGUS, JR.**
                          **Magistrate Judge Chelsey M. Vascura**

### OPINION AND ORDER

       The matters before the Court are Plaintiffs' Golden Home Health Care, LLC, Hari Puri and Hema Sanyasi (collectively "Plaintiffs") Amended Motion for a Preliminary Injunction[1] (ECF No. 9) and Defendant Seema Verma's Motion to Dismiss (ECF No. 12).  The parties have responded and replied to the motions.  Thus, the motions are ripe for review.  For the following reasons, the Amended Motion for a Preliminary Injunction (ECF No. 9) is **DENIED** and the Motion to Dismiss (ECF No. 12) is **GRANTED**.

### I. BACKGROUND

       Plaintiff Golden Home Health Care, LLC ("Golden Home") filed this suit, along with a Motion for a Preliminary Injunction, on June 9, 2020.  (*See* ECF Nos. 1–2.)  On June 11, 2020, Golden Home filed an Amended Motion for a Preliminary Injunction.  (*See* Am. Mot. Prelim. Inj., ECF No. 9.)  Next, Defendant Seema Verma, sued in her official capacity as the Administrator of the Centers for Medicare and Medicaid Services (the "CMS Administrator"), filed a Motion to

---

[1] Subsequent to Golden Home filing the Amended Motion for a Preliminary injunction, Golden Home amended its Complaint to include two additional Plaintiffs, Mr. Puri and Mr. Sanyasi.  (*See* Am. Compl. ¶¶ 71–74.)  The Court assumes Golden Home intended to include these individual Plaintiffs in its Amended Motion for a Preliminary Injunction as it includes them in its arguments in its reply in support of its motion.  (*See e.g.,* Pls.' Reply Supp. Mot. Prelim. Inj. at 2.)  Additionally, as explained throughout this Opinion, the addition of Mr. Puri and Mr. Sanyasi does not change the Court's decision.

Dismiss.  (*See* Mot. Dismiss & Mem. Opp'n Pls.' Am. Mot. Prelim. Inj., ECF No. 12.) Subsequently, Golden Home filed an Amended Complaint which included two new plaintiffs, Hari Puri and Hema Sanyasi.  (*See* Am. Compl., ECF No. 16.)  Finally, both the CMS Administrator and Defendant Maureen Corcoran, sued in her official capacity as the Director of the State of Ohio Department of Medicaid, (the "ODM Director"), moved to dismiss the Amended Complaint.  (*See* Mots. Dismiss, ECF Nos. 23–24.)  In this Order the Court will address the Amended Motion for a Preliminary Injunction and the CMS Administrator's first Motion to Dismiss.

On August 3, 2020, in a telephone conference, the parties agreed that because they largely agreed on the facts of the case and the issues were of law, they did not need a hearing.  (*See* Am. Mot. Prelim. Inj. at 28; Mot. Dismiss & Mem. Opp'n Pls.' Am. Mot. Prelim. Inj. at 41–42.) Instead, the parties agreed the Court could rely on their briefs.  *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 552 (6th Cir. 2007) (indicating "a hearing [on a motion for a preliminary injunction] is only required when there are disputed factual issues, and not when the issues are primarily questions of law."  (citing *Lexington-Fayette Urban Cnty. Gov't v. Bellsouth Telecomm., Inc.*, 14 F. App'x 636, 639 (6th Cir. 2001)).  Thus, the facts as relayed are undisputed unless otherwise indicated.

## 1. Statutory and Regulatory Background

In 1965, Congress created Medicare, the federally funded and administered health insurance program for certain disabled persons under the age of 65 and for individuals aged 65 and over.  42 U.S.C. §§ 1395, *et seq.*  Congress gave the Secretary of Health and Human Services (the "Secretary") the authority to enter into participation agreements with providers of services and to establish a process for which those providers could enroll in the Medicare program and obtain Medicare billing privileges.  *Id.* § 1395cc(a), (j).  The Secretary delegated this responsibility

to the CMS Administrator. *Id.* § 1395kk-1. As part of such authority, the CMS Administrator now contracts with Medicare Administrative Contractors, such as Palmetto GBA ("Palmetto") to perform certain functions such as processing enrollment applications. *See id.*

Additionally, in 1965 Congress established Medicaid through which the federal government gives money to the States for purposes of paying the medical costs of people whose income and resources are insufficient to meet the costs of necessary medical services. 42 U.S.C. § 1396, *et seq.* In 2013, the Ohio General Assembly created the Ohio Department of Medicaid ("ODM") which assumed responsibility and authority over Ohio's Medicaid program. Ohio Rev. Code Chapter 5162.

### a. The Enrollment Process

In order to receive payment for Medicare covered services, a provider of services, such as a home health agency ("HHA"), must enroll in the Medicare program and enter into a participation agreement with CMS. *Id.* §§ 1395x(u), 1395cc(a); 42 C.F.R. §§ 424.505, 489.10. A provider of services must meet the Medicare conditions of participation applicable to that provider. 42 C.F.R. §§ 488.3(a), 489.10(a); 42 C.F.R. Part 424; 42 C.F.R. Part 484 (basic enrollment requirements). Compliance with such conditions is generally verified through a survey by the state survey agent. *See id.* §§ 488.4, 488.24, 489.13(a)(1).

If CMS determines a provider meets the requirements for participating in the Medicare program as an HHA, CMS approves the provider agreement and notifies the HHA of the effective date of the agreement. *Id.* § 489.11(a), (c)(2). If CMS determines the provider does not meet all of the federal requirements, the application is denied. *Id.* § 424.530(a), 489.12. If the HHA's request to participate in the Medicare program is denied, or the HHA's request is approved but the HHA disagrees with the effective date determination, it may request reconsideration of that

3

determination.  *Id.* §§ 498.3(b)(1), (15), (17), 498.22.  If the HHA is dissatisfied with the reconsideration decision, it may request a hearing before an Administrative Law Judge ("ALJ").  *Id.* §§ 498.5(c), (1), (3), 498.83.  If the HHA disagrees with the ALJ's decision, it may request review by the Departmental Appeals Board (the "Board").  *Id.* § 498.83.  The Board's decision is subject to judicial review.  *See id.* §§ 498(c), (1), (3), 498.90(n); 42 U.S.C. § 1395cc(h)(1).

Additionally, once an HHA is certified for Medicare participation, in order to participate in Ohio's Medicaid program, the HHA must enter into a provider agreement with ODM.  *See* Ohio Admin. Code §§ 5160-12-03(A), (B)(1), (B)(5), 5160-12-01(E).  "Home health services" in Ohio, including home health nursing, home health aide services, and skilled therapies, may only be provided by HHA's that are Medicare-certified and meet Ohio's requirements.  *See Id.* § 5160-12-01(A), (E).  ODM shall terminate an HHA's provider agreement if "[a]ny license, permit, or certification that is required in the provider agreement or department rule has been denied, suspended, revoked, or otherwise limited and the provider has been afforded the opportunity for a hearing."  *Id.* at § 5160-1-17.6(I)(1).

### b. Deactivation of Medicare Billing Privileges

A deactivation "means that the provider or supplier's billing privileges were stopped but can be restored upon the submission of updated information."  *Id.* § 424.502.  A deactivation "is considered an action to protect the provider or supplier from misuse of its billing number to protect the Medicare Trust Funds from unnecessary overpayments."  *Id.* § 424.540(c).  A deactivation does "not have any effect on a provider or supplier's participation agreement or any conditions of participation."  *Id.*  No payment may be made, however, for services furnished to a Medicare beneficiary if the provider's billing privileges are deactivated.  *Id.* § 424.555(b).  The Secretary has authorized CMS to deactivate a provider's Medicare billing privileges for three reasons:

4

> (1) The provider or supplier does not submit any Medicare claims for 12 consecutive calendar months. The 12 month period will begin the 1st day of the 1st month without a claims submission through the last day of the 12th month without a submitted claim.
>
> (2) The provider or supplier does not report a change to the information supplied on the enrollment application within 90 calendar days of when the change occurred. Changes that must be reported include, but are not limited to, a change in practice location, a change of any managing employee, and a change in billing services. A change in ownership or control must be reported within 30 calendar days as specified in §§ 424.520(b) and 424.550(b).
>
> (3) The provider or supplier does not furnish complete and accurate information and all supporting documentation within 90 calendar days of receipt of notification from CMS to submit an enrollment application and supporting documentation, or resubmit and certify to the accuracy of its enrollment information

*Id.* § 424.540(a).

In order to reactivate billing privileges, the provider must complete a new enrollment application or certify the information on file is correct. *Id.* § 424.540(b)(1), (2). Additionally, the HHA must obtain a state survey. *Id.* § 424.540(b)(3)(i).

A deactivation is not an initial determination subject to review under the appeal procedures. *Id.* § 498.3(b) (not listing a deactivation as an initial determination). A provider whose billing privileges are deactivated, however, may file a rebuttal. *Id.* § 424.545(b). The CMS's decision in response to a rebuttal statement is not appealable. *Id.* § 405.375(c).

### c. Changes in Ownership

A provider enrolled in Medicare must report certain changes in its enrollment information, such as a change in ownership, to CMS within 30 days. *Id.* §§ 424.516(e)(1), 489.18(b) ("A provider who is contemplating or negotiating a change of ownership must notify CMS."). Before completing the change in ownership, the current owner and the prospective new owner must submit enrollment applications. *Id.* § 424.550(b). The provider agreement is assigned to the new

owner unless the new owner indicates he or she does not wish to accept the agreement.  *Id.* § 489.18(c).

CMS has imposed restrictions on the transfer of an HHA agreement and Medicare billing privileges to a new owner when a change in majority ownership occurs within 36 months of the HHA's initial enrollment or most recent change in majority ownership (the "36-Month Rule").  *Id.* §§ 424.550(b)(1).  A change in majority ownership occurs when "an individual or organization acquires more than a 50 percent direct ownership interest in an HHA during the 36 months following the HHA's initial enrollment into the Medicare program or the 36 months following the HHA's most recent change in majority ownership (including asset sale, stock transfer, merger, and consolidation)."  *Id.* § 424.502.

CMS has explained the purpose behind this restriction.  Prior to the 36-Month Rule, HHAs were enrolling in Medicare solely to sell their Medicare billing privileges and provider agreements to third parties.  *See* 75 Fed. Reg. 70372-01, 70419–20 (Nov. 17, 2010).  In these scenarios, CMS was often notified of the sale after the HHA was sold and the billing privileges had transferred to the new owner.  *See id.*  Surveys after a change in ownership do not occur with the same frequency as when a provider is initially enrolled in Medicare, and thus, CMS could not "conclusively ascertain" whether the business, under new ownership, met the HHA conditions of participation.  *Id.*  These HHAs had minimal incentive for ensuring quality care for patients as they planned to sell the business shortly after they enrolled.  *See id.*  CMS emphasized its concern over "turn-key businesses," "the certificate mill process," and "flipping."  *Id.*

The regulations require that, if the 36-Month Rule applies, the new owner of the HHA must (1) enroll in the Medicare program as a new HHA and (2) obtain a state survey or an accreditation from an approved accreditation organization.  42 C.F.R. § 424.550(b)(1).  CMS has instructed

Medicare contractors to deactivate a provider's Medicare billing privileges if a change in majority ownership occurs which implicates the 36-Month Rule.  (Mot. Dismiss & Mem. Opp'n Pls.' Am. Mot. Prelim. Inj. at Ex. 1, Medicare Program Integrity Manual ("MPIM"), Ch. 15, § 15.26(E).)

## 2.  Statement of Facts

In March of 2011, Golden Home filed a provider initial enrollment application for a Medicare certified HHA which identified Gifty Kwayke as Golden Home's sole owner.  (Am. Compl. ¶ 20.)  On June 29, 2012, the CMS Division of Survey and Certification issued Golden Home a letter stating that its effective date in the Medicare program was February 14, 2012.  (*Id.* ¶ 21.)  The letter approved Golden Home to provide "skilled nursing services, physical therapy, occupational theory, speech therapy, and [HHA] services."  (*Id.*, Ex. 3.)

On January 1, 2014, Gifty Kwakye transferred 100% of her ownership interest in Golden Home to her husband Edward Kwayke.  (*Id.* ¶¶ 22–23.)  On March 18, 2015, Golden Home submitted a CMS-755A Medicare Change of Ownership Application ("CHOW") to Palmetto.  (*Id.* ¶ 25.)  The CHOW notified Palmetto of the ownership conveyance.  (*Id.*)  On June 3, 2015, Palmetto issued Golden Home a letter approving of the change in ownership interest.  (*Id.* ¶ 26, Ex. 5.)  On February 5, 2015, and again on September 8, 2016, CMS surveyed Golden Home and found it in compliance with federal regulations.  (*Id.* ¶¶ 26–27.)

On December 21, 2016, Edward Kwakye transferred 50% of his ownership interest in Golden Home to Hari Puri and 50% to Hema Sanyasi.  (*Id.* ¶ 28.)  On December 27, 2016, Golden Home submitted a CHOW informing Palmetto of this transfer.  (*Id.* ¶ 29.)  On February 9, 2017, Palmetto sent Golden Home confirmation that it updated its provider information to reflect the change of ownership.  (*Id.* ¶ 30.)  On February 23, 2017, CMS conducted a post survey revisit and again found Golden Home in compliance with federal regulations.  (*Id.* ¶ 31.)

On January 19, 2018, Mr. Sanyasi transferred his entire interest in Golden Home to Mr. Puri.  (*Id.* ¶ 33.)  On February 23, 2018, Golden Home submitted a CHOW to Palmetto to reflect this change.  (*Id.* ¶ 34.)  On April 26, 2018, Palmetto issued Golden Home a notice informing it that its Medicare billing privileges had been deactivated effective April 26, 2018 because the February 23 CHOW violated the 36-Month Rule.  (*Id.* ¶ 35.)  On May 3, 2018, Golden Home disputed this determination through a rebuttal.  (*Id.* ¶ 36.)

On August 3, 2018, CMS issued a rebuttal determination finding that while the February 23 CHOW did not violate the 36-Month Rule, the change in ownership on January 1, 2014 had violated the 36-Month Rule.  (*Id.* ¶ 37.)  Thus, CMS upheld the deactivation of Golden Home's billing privileges.  (*Id.*)  The rebuttal determination instructed Golden Home to submit a new Medicare enrollment application to reactivate its Medicare billing privileges.  (*Id.* ¶ 38.)

On August 21, 2018, Golden Home requested a hearing before an ALJ to contest the deactivation.  (Mot. Dismiss & Mem. Opp'n Pls.' Am. Mot. Prelim. Inj. at Ex. 3.)  Golden Home argued that CMS did not have authority to deactivate its billing privileges.  (*Id.*)  CMS moved to dismiss the appeal, arguing that Golden Home did not have the right to a hearing challenging CMS's deactivation determination.  (*Id.* at Ex. 4.)  Golden Home notified the ALJ it would not be filing a response to the motion and on October 12, 2018, the ALJ dismissed the case.  (*Id.* at Ex. 5.)  Golden Home did not appeal to the Board.  (*Id.*)  In October of 2018, Golden Home filed a new application with Palmetto.[2]  (*Id.* ¶ 39.)

On March 25, 2019, ODM issued Golden Home a notice that its Medicaid Provider Agreement was terminated effective April 26, 2018.  (*Id.* ¶ 40.)  The notice stated that Golden

---

[2] Golden Home's original Complaint contended this application was still pending.  (*See* Compl. ¶ 34.)  This allegation does not appear in the Amended Complaint.  (*See* Am. Compl.)  The CMS Administrator contends that on November 18, 2019, Palmetto rejected Golden Home's enrollment application for failing to respond to a development request for additional information.  (Mot. Dismiss & Mem. Opp'n Pls.' Am. Mot. Prelim. Inj. at 13, Ex. 6.)

Home had failed to meet all provider eligibility requirements, specifically the requirement to hold a Medicare license, permit, or certificate as a condition of eligibility for participation in the Ohio Medicaid program. (*Id.* ¶ 40, Ex. 12.) Golden Home stopped billing Medicaid and terminated approximately 179 patients and referred them to other providers. (*Id.* ¶ 43.)

On June 6, 2019, ODM notified Golden Home of an overpayment of $2,195,200.74 plus interest in the amount of $27,785.83 from April 26, 2018 through June 6, 2019, with additional interest accruing at $30.78 per day. (*Id.* ¶ 45.) On August 1, 2019, Golden Home requested reconsideration disputing the alleged overpayment and interest and requesting reinstatement of the Medicaid Provider Agreement. (*Id.* ¶ 46.) ODM has not responded to this request. (*Id.* ¶ 48.)

There are three claims in this action against the CMS Administrator and the ODM Director. (*See* Am. Compl. ¶¶ 58–74.) Golden Home brings Count I under 42 U.S.C. § 1983 alleging a violation of its Fifth and Fourteenth Amendment rights to due process. (*Id.* ¶¶ 58–64.) Count I alleges that CMS violated Golden Home's due process rights when it deactivated its billing privileges without prior notice or a meaningful right to appeal. (*See id.*) Additionally, Count I alleges that ODM violated its due process rights when it terminated Golden home's provider agreement without prior notice or a meaningful right to appeal. (*See id.*)

In Count II Golden Home seeks a declaratory judgment under 28 U.S.C. § 2201. (*Id.* ¶¶ 65–70.) Golden Home asks the Court to declare that ODM misapplied Ohio law and improperly interpreted federal law to terminate Golden Home's provider agreement. (*Id.*) Additionally, Count II asks the Court to declare that CMS is equitably estopped from using the change in ownership from Gifty to Edward Kwakye as a basis for deactivation and from deactivating Golden Home's billing privileges. (*See id.*) Count III is brought by Mr. Puri and Mr. Sanyasi under the Medicaid Act 42 U.S.C. § 1396a(a)(23). (*Id.* ¶¶ 71–74.) Count III alleges that CMS and ODM's actions

denied Mr. Puri and Mr. Sanyasi their right to choose a willing and qualified health care provider. (*See id.*)  Plaintiffs ask the Court for injunctive and declaratory relief including reactivating Golden Home's billing privileges and reinstating their provider agreement.  (*See id.*)

Plaintiffs now come before the Court and ask for a preliminary injunction requiring: (1) CMS to reactivate Golden Home's Medicare billing privileges and (2) ODM to reinstate Golden Home's Medicare provider agreement.  Additionally, the CMS Administrator asks the Court to dismiss Counts I and II.  The Court will begin with the motion to dismiss and then move to the preliminary injunction.

## II. THE CMS ADMINISTRATOR'S MOTION TO DISMISS

The CMS Administrator moves to dismiss Counts I and II of the Amended Complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction.  Federal Rule of Civil Procedure 12(b)(1) provides for dismissal when the court lacks subject matter jurisdiction.  Without subject matter jurisdiction, a federal court lacks authority to hear a case. *Thornton v. Sw. Detroit Hosp.*, 895 F.2d 1131, 1133 (6th Cir. 1990).  "The plaintiff bears the burden of establishing subject matter jurisdiction over a claim." *Southern Rehab. Grp., P.L.L.C. v. Sec'y of HHS*, 732 F.3d 670, 680 (6th Cir. 2013) (citations omitted).  "Motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).  The CMS Administrator's Motion to Dismiss is a facial attack.

A facial attack "questions merely the sufficiency of the pleading[,]" and the trial court therefore takes the allegations of the complaint as true and construed in the light most favorable to the nonmoving party.  *Wayside Church v. Van Buren Cnty.*, 847 F.3d 812, 816 (6th Cir. 2017) (quotations omitted); *Ritchie*, 15 F.3d at 598.  To survive a facial attack, the complaint must contain

a short and plain statement of the grounds for jurisdiction. *Rote v. Zel Custom Mfg., LLC*, 816 F.3d 383, 387 (6th Cir. 2016). When subject matter jurisdiction is challenged, "the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990).

The CMS Administrator argues that the Court lacks subject-matter jurisdiction because claims arising under the Medicare act can only be filed in federal court if first channeled through the administrative review process. (Mot. Dismiss & Mem. Opp'n Pls.' Am. Mot. Prelim. Inj. at 1.) The CMS Administrator contends Golden Home has not channeled its claim through the administrative review process and thus, there is no jurisdiction for judicial review. (*Id.*)

**1. Obtaining Judicial Review in Medicare Cases**

The Supreme Court has described "two competing jurisdictional routes through which [a plaintiff] arguably might seek to mount [a] legal attack" on Medicare regulations and policies. *See Shalala v. Ill. Council on Long Term Care*, 529 U.S. 1, 7–10 (2000). The first route is federal question jurisdiction as set forth in 28 U.S.C. § 1331, which simply states that "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." The second route is "the special Medicare review route" which "is set forth in a complex set of statutory provisions, which must be read together." *Id*. at 7–8; *see also* 42 U.S.C. §§ 1395cc(h)(1)(A), 1395ii, § 405(g), (h). "[I]n order to obtain judicial review under § 405(g), [the Medicare review route,] a party must comply with (1) a nonwaivable requirement of presentation of any claim to the Secretary, and (2) a requirement of exhaustion of administrative review, which the Secretary may waive." *Cathedral Rock of N. Coll. Hill, Inc. v. Shalala*, 223 F.3d 354, 359 (6th Cir. 2000) (citations omitted); *see also Ill. Council*, 529 U.S. at 15 ("[Section] 405(g) contains a nonwaivable and nonexcusable requirement than an individual present a claim

to the agency before raising it in court."); *Southern Rehab. Grp.*, 732 F.3d at 680 (noting there is a "nonwaivable and nonexcusable ***presentment*** requirement, which mandates that 'virtually all legal attacks' be presented to the agency—including constitutional challenges." (emphasis in original) (citing *Ill. Council*, 529 U.S. at 7)).

42 U.S.C. § 405(h) "channels, most, if not all, Medicare claims, through this special review system." This section states:

> (h) Finality of [the Secretary's] decision.
>
> The findings and decision of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal, or governmental agency except as herein provided. **No action against the United States, the Commissioner of Social Security, or any officer or employee thereof shall be brought under section 1331 or 1346 of title 28 to recover on any claim arising under this subchapter.**

(Emphasis added). "Title 42 U.S.C. §1395ii makes § 405(h) applicable to the Medicare Act 'to the same extent as' it applies to the Social Security Act." *Ill. Council*, 529 U.S. at 15. Per this statute, in cases against the United States *arising under* the Medicare Act plaintiffs cannot use § 1331 to obtain jurisdiction and instead must exhaust their administrative remedies and present their claims to the Secretary prior to obtaining judicial review.

Thus, to determine whether § 405(h) bars federal-question jurisdiction, the inquiry is whether the claim arises under the Medicare Act. *Heckler v. Ringer*, 466 U.S. 602, 615 (1984). The "claims arising under" language is to be construed "quite broadly to include any claims in which both the standing and the substantive basis for the presentation of the claims" is the Medicare Act as well as those that are "inextricably intertwined with a claim for benefits." *Id.* at 614–15, 24 (quotations omitted). "It is of no importance" that plaintiffs seek only declaratory and injunctive relief and "not an actual award of benefits." *Id.* at 615; *see also Ill. Council*, 529 U.S.

at 13–14 ("Nor can we accept a distinction that limits the scope of §405(h) to claims for monetary benefits."). Similarly, it does not matter if the plaintiff brings suit under a law other than the Medicare Act. *See Weinberger v. Salfi*, 422 U.S. 749, 762 (1975) (finding § 405(h) extends "irrespective of whether resort to judicial process is necessitated by discretionary decisions of the Secretary or by his nondiscretionary application of allegedly unconstitutional statutory restrictions"). "Based on this interpretation of § 405(h), virtually all legal challenges to an administrative determination must be channeled through the Secretary's administrative process before judicial review is available as set forth in § 405(g), and any claimed exceptions to this requirement of exhaustion of administrative remedies must be examined critically." *Cathedral Rock*, 223 F.3d at 359.

The CMS Administrator contends that the claims against her in the Second Amended Complaint "arise under" the Medicare Act as they challenge CMS's decision to deactivate billing privileges which "relates directly to Golden Home's eligibility to receive payments from Medicare." (Mot. Dismiss & Mem. Opp'n Pls.' Am. Mot. Prelim. Inj. at 16–17.) Golden Home does not dispute that the claims arise under the Medicare Act. (*See* Pls.' Reply Supp. Mot. Prelim. Inj. at 9–10, ECF No. 17.)

The CMS Administrator contends there is no jurisdiction because Golden Home did not satisfy the presentment requirement. (Mot. Dismiss & Mem. Opp'n Pls.' Am. Mot. Prelim. Inj. at 17–18.) The CMS Administrator points out that Golden Home submitted a rebuttal after the deactivation and requested a hearing before an ALJ, but in neither of these instances did Golden Home raise any constitutional challenges to the deactivation procedure. (*Id.*) Additionally, when CMS moved to dismiss the case before the ALJ, Golden Home again failed to bring its due process claim and instead did not respond. (*Id.*) Thus, the case was dismissed and became binding. (*Id.*)

Plaintiff did not appeal this dismissal to the Board.  (*Id.*)  In response, Golden Home contends that because rebuttal decisions are not appealable it was left without administrative remedies.  (Am. Mot. Prelim. Inj. at 13–14.)  Thus, Golden Home contends, an exception applies, and it need not use the Medicare agency review route to obtain judicial review.  (*Id.*)

### 2.  The Michigan Academy Exception

The Supreme Court created an exception under *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667 (1986) to the Medicare review route laid out in § 405(g), (h).  The Sixth Circuit has explained that "in order to determine whether the Michigan Academy exception applies" courts must examine whether a plaintiff is "being denied altogether the opportunity for judicial review" or "simply being required to seek review through the agency."  *Cathedral Rock*, 223 F.3d at 361.  If a plaintiff is denied altogether the opportunity for review, then the Michigan Academy exception applies and there is jurisdiction notwithstanding a failure to present or exhaust the claim.  *See id.*  Here, Golden Home argues that it "was left in the position of having no review of CMS's determination whatsoever, [thus,] the Michigan Academic exception . . . is applicable." (Pls.' Reply Supp. Mot. Am. Prelim. Inj. at 13.)  The Court disagrees.

The parties agree that the Board lacks the authority to review the initial deactivation of Golden Home's Medicare billing privileges.  Importantly, they also agree, as does the Court, that the Board has jurisdiction to review the determination made on the subsequent new enrollment application that CMS directed Golden Home to submit in its response to Golden Home's rebuttal statement.  *See* 42 C.F.R. § 498.3(b)(17) (including the denial or revocation of a provider or supplier's Medicare enrollment as an initial determination subject to review).  Additionally, if the new application is approved, Golden Home can challenge its effective date.  *See id.* § 498.3(b)(15) (listing the effective date of the provider agreement as an initial determination subject to review).

Thus, Golden Home has not been not left altogether without an opportunity for administrative review of its lost billing privileges.

While the Board cannot review the validity of the initial deactivation during these proceedings, a record will be created of the circumstances of the deactivation.[3] *See e.g.*, *Chaplin Lui, M.D.*, DAB No. 2967 (2019) (Mot. Dismiss & Mem. Opp'n Pls.' Mot. Am. Prelim. Inj. at Ex. 8) (reviewing an appeal of the effective date of an enrollment application and including a chronology of the events leading to the deactivation in the decision). This is important for the court to fully understand the proceedings as well as for the agency as it "provides the agency the opportunity to reconsider its policies, interpretations, and regulations in light of those challenges." *Ill. Council*, 529 U.S. at 24. While proceeding through the agency to create a record will likely produce delay, "in the context of a massive complex health and safety program such as Medicare, embodied in hundreds of pages of statutes and thousands of pages of often interrelated regulations" the Supreme Court has found that "paying this price may seem justified." *Id.* at 23.

Golden Home makes much of the fact that while it can challenge the subsequent new enrollment and the time it becomes effective; it cannot challenge the basis for deactivation. (Pls.' Reply Supp. Mot. Prelim. Inj. at 10.) Importantly, however, "[t]he fact that the agency might not provide a hearing for that ***particular contention***, or may lack the power to provide one, is beside the point because it is the 'action' arising from the Medicare Act that must be channeled through the agency." *Id.* at 23 (internal citations omitted) (emphasis in original). For example, in *Illinois Council*, the plaintiffs, several nursing homes, complained that while they could challenge the

---

[3] Golden Home argues that even if their billing privileges are reinstated there will be a gap where it was not able to bill for services. Golden Home argues an ALJ would invariably conclude the gap in loss of billing privileges was acceptable as in *Urology Group of NJ, LLC*, DAP No. 2860 (2018), and thus, any appeal would be futile. The question under *Michigan Academy* is not, however, whether an appeal would be futile, but whether there are additional appeals which can be taken to exhaust and present the claims prior to judicial review. *Cathedral Rock*, 223 F.3d at 361. Additionally, ALJ decisions are not binding on the DAB or other ALJs and thus, Golden Home cannot be entirely sure of the outcome. *See West Tex. LTC Partners, Inc. v. United States HHS*, 843 F.3d 1043, 1047 (5th Cir. 2016).

termination of their provider agreements through the agency, they could not challenge the basis upon which the agency had found them noncompliant. *See id.* Due to this inability to challenge the basis upon which they were found noncompliant, which lead to the termination of their agreements, the plaintiffs asked the Court to apply the Michigan Academy exception and thus, allow them to bring suit under § 1331 and not under § 405. *See id.* The Supreme Court declined to apply the exception, noting that the question was whether the agency could review the "action," which was the termination of the provider agreements. *See id.* Because the agency could review the action, the plaintiffs were not left without access to the agency review process and thus, were required to take advantage of such access. *See id.*

The same is true here. The "action" is the loss of billing privileges. While the agency cannot review the basis for the deactivation, the agency can, and therefore must, review the new enrollment agreement providing new billing privileges and the time those billing privileges take effect. Thus, Golden Home's argument that it cannot challenge the basis for deactivation in the agency does not prevent a finding that the claims it makes in this Court are subject to § 405(g)'s agency review process.

Golden Home also contends this case is like *Bartlett Memorial Medical Center v. Thompson*, 347 F.3d 828 (10th Cir. 2003). In *Barlett* the plaintiffs, many hospitals, had previously obtained a court ruling that the Secretary was incorrectly interpreting certain regulations related to reimbursements which had resulted in lower payments. *Id.* at 830–31. After that ruling the Secretary decided the new interpretation would only be applied prospectively. *Id.* at 830. The plaintiffs were unhappy with this prospective application and requested the Secretary reopen their previous cost reports and adjust them to reflect the new interpretation. *Id.* Their request was denied, and the plaintiffs unsuccessfully sought appeal as the agency held it had no authority to

review a denial of a reopening of cost reports. *Id.* The Tenth Circuit found the Michigan Academy exception applied and therefore there was federal question jurisdiction. *Id.* at 843–44. The Court reasoned that because the Board had no jurisdiction to examine the action, the reopening of the case files, the plaintiffs were left with no avenue to pursue their claims before the agency. *Id.*

*Bartlett* is distinguishable from this case because the plaintiffs in *Bartlett* had no other avenues of redress through which to pursue their claims before the agency and thus without federal question jurisdiction had "no review at all." *Id.* at 844. This is simply not true in this instance. While Golden Home is correct that in both cases the plaintiffs challenge a particular interpretation of a regulation as unconstitutional, Golden Home has not been left without any way to pursue its claims within the agency. As detailed above, after a deactivation an HHA can file a new enrollment application and then can appeal a denial or appeal the date on which the application becomes effective. In *Bartlett*, the action sought to reopen billing records, which was not appealable to the agency. Here, the action seeks to reinstate Golden Home's billing privileges, which through filing a new enrollment application, is appealable. Golden Home is required to complete the agency review process of enrolling in Medicare and, if it is unhappy with any gap where its billing privileges were not active, it can appeal such gap by appealing the date on which the application became active. Once this process is finished Golden Home can seek judicial review of any issues it had with the process, including any claim of unconstitutional action in deactivating the billing privileges.

Golden Home must remember that "the relevant question is not whether a particular case involves 'added inconvenience or cost.' The relevant question is whether the hardship 'turns what appears to be simply a channeling requirement into *complete* preclusion of judicial review.'" *Southern Rehab Grp.*, 732 F. 3d at 682 (quoting *Ill. Council*, 529 U.S. at 22–23). Here there is not

a complete preclusion of review and thus the Michigan Academy exception does not apply.[4]

While other exceptions exist, as Golden Home points out with regard to its claim against the ODM Director for termination of the provider agreement, Golden Home does not argue any other exceptions apply to its claims against the CMS Administrator. Thus, the Court concludes that it does not have subject-matter jurisdiction to consider the claims against the CMS Administrator.[5] Accordingly, the CMS Administrator's Motion to Dismiss Counts I and II of the Amended Complaint is **GRANTED**.

### III. GOLDEN HOME'S AMENDED MOTION FOR A PRELIMINARY INJUNCTION

Rule 65 of the Federal Rules of Civil Procedure provides for injunctive relief when a party demonstrates that it will suffer immediate and irreparable injury, loss, or damage. Still, an "injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

In determining whether to issue a preliminary injunction, the Court must examine four factors: (1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would

---

[4] The only other district court which this Court is aware of which has considered the issue has come to the same result. *See Kaminsky v. Missouri*, No.4:07-CV-1213, 2007 U.S. Dist. LEXIS 67056, at *7–8 (E.D. Mo. Sept. 11, 2007) (concluding the court did not have subject matter jurisdiction over a claim against CMS to reactive billing privileges because the regulations provide additional means to reactive such privileges, namely the filing of a new enrollment application. (citing 42 C.F.R. § 424.540(b)(2)).

[5] The Court need not address the CMS's additional argument that under § 405(g) this case was not timely filed. Notably, however, as the CMS Administrator points out, §405(g) which requires a civil action to be commenced within 60 days after the mailing of the notice of the disputed decision. *See Cook v. Comm'r of Soc. Sec.*, 480 F.3d 432, 435 (6th Cir. 2007) ("The 60-day limit for seeking judicial review of an adverse Social-Security-benefits determination is not jurisdictional but a period of limitations." (citation omitted)). CMS issued its response to Golden Home's rebuttal statement on August 3, 2018, and the appeal was dismissed on October 12, 2018. (Am. Compl. ¶ 37; Mot. Dismiss & Mem. Opp'n Pls.' Am. Mot. Prelim. Inj. at Ex 4.) This case was filed long after 60 days had passed.

be served by issuing the injunction. *Id.* (citing *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000)); *McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir.1997) (en banc). These considerations are factors which a court must balance, not prerequisites that must be met. *Id.* (citing *United Food & Com. Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 347 (6th Cir. 1998)).

Defendants argue that the preliminary injunction should not be granted because: the Eleventh Amendment bars the Court from ordering the ODM Director to comply with state law and from ordering retroactive injunctive relief; the delay in seeking this injunction shows there is no irreparable harm; and Plaintiffs are not likely to succeed on the merits. The Court will begin with the ODM Director's argument as to the Eleventh Amendment and then will turn to the factors Plaintiffs must show to obtain a preliminary injunction.

### a. Eleventh Amendment Immunity

Under the Eleventh Amendment, federal courts lack jurisdiction to hear suits by private citizens against a State unless the State consents to the suit or unless Congress, pursuant to a valid exercise of power, indisputably demonstrates its intent to abrogate state immunity. *Bedford v. Kasich*, No. 2:11-cv-351, 2011 U.S. Dist. LEXIS 51903, at \*19 (S.D. Ohio May 4, 2011) (citing *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990)); *Smith v. Ohio Legal Rights Serv.*, No. 2:10-cv-1124, 2011 U.S. Dist. LEXIS 46024, at \*15 (S.D. Ohio Apr. 29, 2011). "An entity acting as an arm of the state enjoys Eleventh Amendment immunity from federal suit to the same extent as the state itself." *Yancey v. Los Angeles Superior Court*, No. 5:03-cv-122, 2004 U.S. Dist. LEXIS 330, at \*10 (W.D. Mich. Jan. 2, 2004) (citing *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 47–51 (1994)); S*mith*, 2011 U.S. Dist. LEXIS 46024 at \*15 (citing *Alabama v. Pugh*, 438 U.S. 781, 782 (1978)). Thus, Eleventh Amendment immunity extends to state

officials sued in their official capacity. *McCormick v. Miami Univ.*, No. 1:10-cv-345, 2011 U.S. Dist. LEXIS 48467, at *57 (S.D. Ohio May 5, 2011) (citing *Turker v. Ohio Dep't Rehab. & Corr.*, 157 F.3d 453, 457 (6th Cir. 1998)). This is because a suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office and as such is no different than a suit against the state itself. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

Eleventh Amendment immunity for state officials is limited, however, by the doctrine of *Ex Parte Young*, which the Supreme Court has described as applying "when a federal court commands a state official to do nothing more than from refrain from violating federal law." *See Va. Office for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 248 (2011). In these instances, courts apply a "legal fiction" that the state official is not the state for sovereign immunity purposes. *See id.* As a result, when a state official is sued only for prospective non-monetary relief, such as an injunction, for a violation of federal law, Eleventh Amendment immunity does not apply. *See Ex Parte Young*, 209 U.S. 123, 15–60 (1908); *Smith v. Oakland Cnty.*, 344 F. Supp. 2d 1030, 1056 (E.D. Mich. 2004). Importantly, this doctrine does not apply to a state official's violation of state law, to which Eleventh Amendment immunity does apply. *Penhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984); *see also Ohioans Against Corp. Bailouts, LLC v. LaRose*, 417 F. Supp. 3d 962, 975–76 (S.D. Ohio Oct. 23, 2019) ("A claim that a state official violates state law in carrying out his or her official duties is a claim against the state, which is barred by the Eleventh Amendment, depriving a federal court of jurisdiction to hear the matter."); *Ernst v. Rising*, 427 F.3d 351, 368 (6th Cir. 2005) (en banc) ("[T]he states' constitutional immunity from suit prohibits *all* state-law claims filed against a [s]tate in federal court, whether those claims are monetary or injunctive in nature."). "This conclusion applies even if . . . supplemental jurisdiction

otherwise exists." *Otte v. Kasich*, 709 F. App'x 779, 782 (6th Cir. 2017) (citing *McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery*, 226 F.3d 429, 438 (6th Cir. 2000)).

The ODM Director argues that as a state official being sued in her official capacity the federal court cannot order her to conform her conduct to state law nor can it order retroactive relief against her.  (Def. Mem. Opp'n Pls.' Am. Mot. Prelim. Inj. at 5–7.)  Thus, the ODM Director argues, the Court cannot order her to retroactively reinstate Golden Home's provider agreement in order to conform to state law.  (*See id.*)  Plaintiffs have two main arguments in its reply.  First, they contend that Mr. Puri and Mr. Sanyasi can enforce the Free-Choice-of-Provider Provision under the Medicaid Act and second, the relief is for a violation of federal law and is prospective and thus, can be ordered against the state.

Plaintiffs' first argument is that Mr. Puri and Mr. Sanyasi, who joined this case after Golden Home filed its amended motion for a preliminary injunction, can obtain relief from ODM through 42 U.S.C. § 1396(a)(23) which creates a private right of action that can be enforced through section 1983.  (Pls.' Reply Supp. Mot. Prelim. Inj. at 2–3.)  This argument does not directly address the ODM Director's argument that she cannot be sued because she is immune from suit.  While it may be true that Mr. Puri and Mr. Sanyasi have a private right of action in this case, the question is whether they are suing a state official for an ongoing violation of federal law.

Plaintiffs also contend the relief they seek is purely prospective, seeking to enjoin a continuing violation of federal law and thus, they can sue the ODM Director under the *Ex Parte Young*, exception.  In contrast, the ODM Director asserts that Plaintiffs ask it to end a violation of state law with retrospective relief.  The Court must determine whether Plaintiffs seek to end a violation of federal or state law as well as whether they seek prospective or retrospective relief. The Amended Complaint states that "Defendants' actions violate 42 U.S.C. § 1396a(a)(23)."  (Am.

Compl. ¶ 1; *see also id.* ¶ 72.)  Additionally, the Amended Complaint states that "ODM's decision to terminate Golden Home's Medicaid Provider Agreement is inconsistent with 42 C.F.R. § 424.540(c)," and violated Golden Home's due process rights under both the federal and state constitution.  (*Id.* ¶¶ 62–63, 68.)  Thus, the Amended Complaint alleges violations of both federal and state law.

Similarly, Plaintiffs' motion for a preliminary injunction at times alleges violations of state laws and at times alleges violations of federal laws.  The Court finds that at least some of the claims, as written, are barred by the Eleventh Amendment.  In the Amended Complaint and the motion for a preliminary injunction, Plaintiffs claim that ODM violated state law in terminating Golden Home's Medicaid Provider Agreement.  (*See e.g.,* Am. Compl. ¶ 68 (arguing ODM's action violated "the constitution of State of Ohio"); Am. Mot. Prelim. Inj. at 24 ("ODM's basis for termination is wholly unsupported by federal *and state laws and regulations*" (emphasis added).)  To the extent that Plaintiffs seek to assert claims against the ODM Director, a state official, for a violation of state law, this Court lacks subject matter jurisdiction over such claims.  *See Penhurst State Sch.*, 465 U.S. at 106.  Although the ODM Director did not move to dismiss such claims at this time, and instead only brought up the argument in her response opposing the preliminary injunction, the Court may sua sponte dismiss a claim for lack of subject-matter jurisdiction.  *See King Lincoln Bronzeville Neighborhood Ass'n v. Husted*, No. 2:06-cv-745, 2012 U.S. Dist. LEXIS 15025, at *11–12 (S.D. Ohio Feb. 7, 2012) (finding the Eleventh Amendment barred the plaintiffs' claims and thus, dismissing them and noting that "[t]he existence of subject matter jurisdiction may be raised at any time, by any party, or even sua sponte by the court itself." (quoting *Ogle v. Church of God*, 153 F. App'x 371, 374 (6th Cir. 2005)); *Dyer v. Radcliffe*, 169 F. Supp. 2d 770, 776 (S.D. Ohio 2001) (dismissing claims against a state official and noting that "[t]he Court raises

[the state official's] Eleventh Amendment immunity sua sponte because it goes to the subject matter jurisdiction of this court."). Thus, these claims are **DISMISSED**.

The Court observes, however, that through the Amended Complaint and the Amended Motion for a Preliminary Injunction Plaintiffs mainly argued that ODM, through enforcing its interpretation of state laws and regulations, violated federal Medicaid laws. For example, the Amended Motion for a Preliminary Injunction explains that ODM interpreted Ohio Administrative Code § 5160-1-17.6 to require a termination of a provider agreement when CMS's deactivates billing privileges. (Am. Mot. Prelim. Inj. at 22.) Plaintiffs next state that "this finding is wholly inconsistent with the Secretary's regulations." (*Id.*) Plaintiffs go on to argue that even though CMS "made it abundantly clear that de-activation of an HHA's Medicare billing privileges ha[s] no effect whatsoever on its participation agreement," ODM nonetheless terminated such agreement contrary to the meaning of 24 C.F.R. § 424.540. (*Id.* at 23–24.) Thus, Plaintiffs' central argument with regard to ODM is that in taking actions purportedly in accordance with Ohio regulations, ODM violated federal regulations. This, an argument alleging violations of *federal regulations*, is not prohibited by the Eleventh Amendment in accordance with *Ex Parte Young* as long as it seeks prospective relief. *See Price v. Medicaid Dir.*, 838 F.3d 739, 747 (6th Cir. 2016) (finding that "the plaintiff sought . . . prospective relief in the form of an injunction directing the defendants, Ohio's Medicaid administrators, to cease their practice of providing waiver-program benefits only for the period following an eligibility determination, in purported violation of 42 U.S.C. § 1396a(a)(34) . . . [this] is the kind of prospective injunctive relief that *Ex parte Young* squarely permits.").

Thus, given that Plaintiffs are at least in part alleging a violation of federal law, the Court must examine the relief sought. Plaintiffs seek many different forms of relief, including a

declaration that ODM did not have authority to terminate the provider agreement, declaring ODM did not have authority to collect an overpayment, preventing ODM from collecting on the overpayment, and requiring ODM to reactivate the provider agreement. (*See* Am. Compl. ¶ 74(a)– (n).) The Sixth Circuit has explained that "in suits concerning a state's payment of public benefits under federal law, a federal court may enjoin the state's officers to comply with federal law by awarding those benefits in a certain way going forwards—even if the court may not order those officers to pay out public benefits wrongly withheld in the past." *Price*, 838 F.3d at 747. None of the relief Plaintiffs seek asks for "retroactive monetary relief" and thus, the claims are permissible under the Eleventh Amendment. *See Penhurst State Schls.*, 465 U.S. at 103.

In sum, the preliminary injunction asks, at least in part, for the Court to stop an alleged ongoing violation of federal law through prospective nonmonetary relief and thus, the Eleventh Amendment does not bar these claims. Thus, the Court will move to whether Plaintiffs have upheld their burden to obtain a preliminary injunction.

### b. Irreparable Harm

"Although the different factors that courts consider when ruling on motions for temporary restraining orders must be balanced against each other, the Sixth Circuit has recognized that showing irreparable injury is generally required to warrant injunctive relief." *Kendall Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F. Supp. 2d 853, 865 (S.D. Ohio 2008) (citing *see Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982) ("A district court abuses its discretion when it grants [an injunction] without making specific findings on irreparable injury to the party seeking the injunction."); *see also Premier Dealer Serv. v. Allegiance Admins., LLC*, No. 2:18-cv-735, 2018 U.S. Dist. LEXIS 189879, at * 15 (S.D. Ohio Nov. 6, 2018) ("While no single factor determines whether an injunction should issue, a failure to show irreparable harm can be

fatal to a motion for injunctive relief." (citing *Southern milk Sales, Inc. v. Martin*, 924 F.2d 98, 103 (6th Cir. 1991)).

"[A plaintiff's] delay in seeking a TRO or preliminary injunction does not preclude any possibility of relief or absolutely preclude[] a showing of irreparable harm." *Burton v. Kettering Adventist Health Care*, No. 3:20-cv-209, 2020 U.S. Dist. LEXIS 106411, at *7–8 (S.D. Ohio June 17, 2020) (citations omitted). "The delay, however, is still a factor to be considered." *Id.* at *8 (citation omitted); *see also Kendall Holdings*, 630 F. Supp. 2d at 866 ("The length of time that a party takes to file suit or request injunctive relief is also relevant to the irreparable harm inquiry."). "[I]n addition to being considered in balancing the hardships, delay in pursuing relief undercuts claims of irreparable harm and may be considered as circumstantial evidence that potential harm to [the] plaintiff is not irreparable or as great as claimed." *Id.* (citation omitted); *see also Kendall Holdings*, 630 F. Supp. 2d at 867 ("A delay between the discovery of the allegedly infringing conduct and the request for the injunctive relief can support an inference that the alleged harm is not sufficiently severe or irreparable to justify injunctive relief.").

Plaintiffs contend that if they do not obtain this preliminary injunction then "Golden Home will suffer irreparable harm as the loss of its Medicare billing privileges and Medicaid provider agreement continues to tarnish Golden Home's reputation and goodwill in the Nepalese community in Columbus, Ohio." (Am. Mot. Prelim. Inj. at 24.) Plaintiffs also contend it is suffering irreparable harm by having to discharge its patients, in loss of growth opportunity, and in facing the possibility of having to close its business. (*Id.*) Finally, Plaintiffs state Mr. Puri and Mr. Sanyasi are being harmed by "being denied their freedom to choose any qualified health care provider in the Medicaid program." (Pls.' Reply. Supp. Mot. Prelim. Inj. at 16.)

In response, the ODM Director argues:

> Golden Home has known since March 25, 2019 that its Medicaid provider agreement was terminated. It then waited until June 9, 2020 to seek an injunction reversing that termination. If Golden Home was able to wait 14 months before seeking injunctive relief, it is not likely to suffer irreparable harm if the Court denies the motion now. Indeed, denial of the motion will simply maintain the present circumstances of the parties as have been in effect since last year. This case lacks the urgency required for preliminary injunctive relief.

(Def. Mem. Opp'n Pls.' Am. Mot. Prelim. Inj. at 8 (internal citation omitted).)

The CMS Administrator similar argues that any risk of immediate irreparable harm is belied by Plaintiffs' delay. (Mot. Dismiss & Pls.' Resp. Am. Mot. Prelim. Inj. at 39.) Defendants' argument is well-taken. The Court does not disagree that in some instances a loss of reputation, goodwill, and business can be irreparable harm. *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) (noting that loss of customers and goodwill and the damages flowing from such often amounts to irreparable injury because such damages are difficult to compute). Similarly, the loss of the right to a provider of choice may in some instances be irreparable harm. *See Planned Parenthood of Ind. v. Comm'r of the Ind. State Dep't of Health*, 699 F.3d 962, 980–81 (7th Cir. 2012) (noting absent a preliminary injunction the plaintiffs would suffer irreparable harm because the patients would lose their provider of choice). Golden Home, Mr. Puri, and Mr. Sanyasi cannot, and did not, however, argue against Defendants' contention that there has been a significant delay since Golden Home's provider agreement was terminated. (*See* Pls.' Reply Supp. Prelim. Inj. at 16 (failing to respond to the ODM Director's argument regarding the time since the harm began).) In the 14 months since the provider agreement was cancelled, Golden Home presumably has been losing the same goodwill, business, and reputation as it is now as it stated that when the agreement was terminated it *promptly* stopped services. (Am. Compl. ¶ 43.) Similarly, Golden Home received the notice of the overpayment and interest in June of 2019 and waited a year to ask for injunctive relief to cease the enforcement of such payment. (*Id.* ¶ 45.) Mr.

26

Puri and Mr. Sanyasi have not been able to choose Golden Home as a provider in 14 months. Plaintiffs have not sufficiently argued why the harm has just now become so irreparable as to require the extraordinary relief of a preliminary injunction.

In sum, the extreme delay in seeking this injunction leads the irreparable harm factor to weigh heavily against granting this preliminary injunction which is only to be granted if the movant has carried its burden. *Overstreet*, 305 F.3d at 573.

### c. Likelihood of Success on the Merits

#### i. Count I: Violation of Due Process

In Count I of the Amended Complaint Plaintiffs contend that "ODM terminated Golden Home's Medicaid provider agreement without prior notice or a meaningful right to appeal the decision before a judicial or quasi-judicial body resulting in a violation of Golden Home's due process rights with respect to its constitutionally protected interest and continued participation in Ohio's Medicaid program." (Am. Compl. ¶ 63.) Plaintiffs, however, offer no argument in support of this due process claim in the amended motion for a preliminary injunction. Thus, the claim appears to be abandoned. Even if the claim is not abandoned, the Sixth Circuit has held there is no protected property interest in being a provider in federal healthcare programs and thus, Plaintiffs cannot succeed on the merits of this claim. *See Parrino v. Price*, 869 F.3d 392, 397 (6th Cir. 2017).

#### ii. Count II: Declaratory Judgment

Plaintiffs argue that they have a strong likelihood of success on the claim for a declaratory judgment against ODM because ODM terminated Golden Home's provider agreement based on an erroneous conclusion that Golden Home had lost its Medicare license and or certification and thus, Ohio Administrative Code § 5160-1-17.6 required termination of the agreement. (Am. Mot.

Prelim. Inj. at 21.)  Plaintiffs contend this conclusion was inconsistent with the federal regulations when the public comments and CMS's responses to such are examined.  (*Id.* at 22.)  Plaintiffs point out that CMS stated "the deactivation of a provider's Medicare billing privileges does not mean that the provider is no longer enrolled in Medicare.  In fact, the Medicare provider agreement remains in effect.  Accordingly, a deactivated HHA is still certified as a Medicare HHA."  (*Id.* (citing 74 Fed. Reg. 58078, 58119 (Nov. 10, 2009).)  Additionally, Plaintiffs contend CMS stated that because § 424.540(c) "provides '[t]he deactivation of Medicare billing privileges does not have any effect on a provider or supplier's participation agreement or any conditions of participation' it should eliminate any confusion that §  424.550(b)(3)'s requirement to obtain an initial State survey would equate to decertification and 'will eliminate the perception that deactivation and decertification are one in the same.'"  (*Id.* (citing 74 Fed. Reg. 58078, 5811–20 (Nov. 10, 2009).)

Plaintiffs contend that ODM therefore was notified that CMS's interpretation of the regulations made clear deactivation did not affect the provider agreement.  (*Id.* at 23–24.) Nonetheless, Plaintiffs contend, ODM terminated its provider agreement finding it failed to hold a valid license, permit, or other legal certification as required by Ohio law.  (*Id.* at 24.)

In response, the ODM Director contends that "Golden Home's Medicare certification was both required by its Medicaid provider agreement and 'otherwise limited' when Golden Home's billing privileges were deactivated."  (Def. Mem. Opp'n Pls.' Am. Mot. Prelim. Inj. at 9.)  The ODM Director notes that Golden Home's Medicaid provider agreement, which was revalidated in 2017, required it to be Medicare-certified.  (*Id.* at Ex. A.)  Additionally, the ODM Director notes that "[w]hen billing privileges have been deactivated, '[n]o payment may be made for otherwise Medicare covered items or services'" and thus, "that stoppage of payment is properly viewed as a

limitation on the Medicare certification of the provider." (*Id.* at 9–10 (quoting 42 C.F.R. § 424.555(b).)  The ODM Director further explains that it does not disagree with Plaintiffs' contention that the regulations, as explained by CMS through comments, do not require the termination of a provider agreement when billing privileges are deactivated. (*id.* at 10.)  Ohio law, however, does require termination of the provider agreement because a deactivation "otherwise limite[s]" such certification. (*Id.* (citing Ohio Admin. Code § 5160-1-17.6(I)(1).)  The ODM Director notes the only other requirement under Ohio law to terminate a provider agreement is that Golden Home was provided a hearing, which in this case it was. (*Id.* at 11 (citing Ohio Admin. Code § 5160-1-17.6(I)(1).)

The parties agree that under the federal regulations the deactivation of billing privileges does not automatically terminate the provider agreement.  Remembering that the question is whether the ODM Director violated federal law, not whether it violated state law as these claims have been dismissed for lack of subject-matter jurisdiction, the question becomes whether the ODM Director violated federal law when it terminated the provider agreement despite the regulation not *requiring* such action.  In other words, while the parties agree the regulation in question does not require such termination, does it prohibit such termination?  Plaintiffs contend it does, but cite to no authority for such contention.

By its plain language, the regulation only states that deactivation does not have an effect on the provider agreement.  24 C.F.R. § 424.540(c).  The regulation is silent in regard to a state's authority to terminate provider agreements based on certain actions by CMS such as deactivation of billing privileges.  *See id.*  Plaintiffs have not provided any argument that the Ohio regulation is somehow preempted by the federal regulation or that another federal regulation or statute explicitly prevents the state from creating their own rules on when an HHA can be a part of a

provider agreement with the state of Ohio.  Importantly, if a State elects to participate in the federal Medicaid program it is the state that administers the program in compliance with federal law.  *See* 42 C.F.R. § 430.10 (noting that the state will administer its plan in conformity with federal regulations).  The Court finds no conflict between the federal and state regulation herein challenged.

Additionally, Plaintiffs have not rebutted the fact that Golden Home's particular provider agreement with ODM required Medicare certification.  (Def.'s Resp. Opp'n Pls.' Mot. Am. Prelim. Inj. at Ex. A.)  The Ohio regulation states ODM shall terminate a provider agreement if any license, permit, or certification, required by the provider agreement is "otherwise limited."  Ohio Admin. Code § 5610-1-17.6(I)(1).  While the federal regulation states that deactivation itself does not affect the provider agreement, Golden Home, by entering into the provider agreement, agreed that if there was any limit on its Medicare certification its provider agreement would terminate. Plaintiffs have not produced any authority that prevents states from entering into such agreements with providers.  Deactivation limits a certification as patient services cannot be billed to Medicare. Plaintiffs have simply not upheld their burden to show that in this case following the state regulation was not in compliance with federal law.  As such, this factor weighs against granting a preliminary injunction.

### iii.    Count III: Medicaid Act

In Count IIII of the Amended Complaint Mr. Puri and Mr. Sanyasi contend that "CMS and ODM's actions violate 42 U.S.C. § 1396a(a)(23) by denying Golden Home's patients, including Hari Puri and Hema Sanyasi and those similarly situated, the right to choose any willing and qualified health care provider in the Medicare/Medicaid programs."  (Am. Compl. ¶ 72.)  Plaintiffs provide a single statement in support of the merits of such claim: "[B]ecause ODM's basis for

terminating Golden Home's Medicaid provider agreement was unlawful and falls outside the range [sic] of grounds justified under the Medicaid Act, Hari Puri, Hema Sanyasi, and members of the proposed class are likely to prevail on the merits of their Medicaid claim."  (Pl.'s Reply Supp. Mot. Prelim. Inj. at 3.)  Plaintiffs provide no legal authority as to whether the statute would have been violated if this statement is true.  Regardless, however, the Court has already found Plaintiffs unlikely to succeed on the merits of their claim that the grounds for the termination of the provider agreement were unlawful.  *See infra* Section III.c.ii.  Plaintiffs have provided no other argument as to their success on the merits of this claim, and thus, they are unlikely to succeed on its merits.

The Court has found Plaintiffs have not shown a likelihood of success on their claims' merits or irreparable harm and thus, the Court need not address the other two factors in the preliminary injunction analysis.  *See Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020) (noting that the conclusion that there is no likelihood of success on the merits is dispositive as Sixth Circuit cases "warn that a court must not issue a preliminary injunction where the movant presents no likelihood of merits success").

### III. CONCLUSION

In sum, the CMS Administrator's Motion to Dismiss (ECF No. 12) is **GRANTED**. Additionally, Plaintiffs' Amended Motion for a Preliminary Injunction (ECF No. 9) is **DENIED**. **IT IS SO ORDERED.**


**8/26/2020**                                  **s/Edmund A. Sargus, Jr.**
**DATE**                                       **EDMUND A. SARGUS, JR.**
                                               **UNITED STATES DISTRICT JUDGE**